**PUBLIC COPY – SEALED MATERIAL DELETED**

ORAL ARGUMENT SCHEDULED FOR MAY 2, 2013

No. 13-5013

IN THE
UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
————————————

FEDERAL ENERGY REGULATORY COMMISSION

APPELLANT,

v.

J.P. MORGAN VENTURES ENERGY CORPORATION,

APPELLEE.
————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

**BRIEF OF APPELLEE J.P. MORGAN VENTURES
ENERGY CORPORATION**

Catherine M. Krupka
SUTHERLAND
700 6th Street, N.W.
Washington, D.C. 20001
(202) 383-0100

Miguel A. Estrada
Robert E. Johnson*
Justin Walker
Christopher B. Leach
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500

* Admitted only in Virginia; practicing under the
supervision of the Principals of the Firm.

*Counsel for Appellee J.P. Morgan Ventures Energy Corporation*

**PUBLIC COPY – SEALED MATERIAL DELETED**

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Appellee J.P. Morgan Ventures Energy Corporation files the following Certificate as to Parties, Rulings, and Related Cases.

### (A) Parties, Intervenors, and *Amici*

The Appellant is the Federal Energy Regulatory Commission.

The Appellee is J.P. Morgan Ventures Energy Corporation.

There are no *amici* or intervenors.

### (B) Ruling Under Review

Appellant has sought review of the Memorandum Order entered November 29, 2012, by Magistrate Judge Deborah A. Robinson in *Federal Energy Regulatory Commission v. J.P. Morgan Ventures Energy Corp.*, No. 1:12-mc-00352-DAR (D.D.C.).

### (C) Related Cases

**PUBLIC COPY – SEALED MATERIAL DELETED**

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and D.C. Circuit Rule 26.1, Appellee J.P.
Morgan Ventures Energy Corporation makes the following disclosures:

J.P. Morgan Ventures Energy Corp. is a wholly-owned subsidiary of
JPMorgan Chase & Co.  JP Morgan Chase & Co. is the only publicly-held compa-
ny that owns 10% or more of J.P. Morgan Ventures Energy Corp.'s stock.

**PUBLIC COPY – SEALED MATERIAL DELETED**

**TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................1

COUNTER-STATEMENT OF THE ISSUES ..........................................4

PERTINENT STATUTORY AND REGULATORY PROVISIONS ....................4

COUNTER-STATEMENT OF THE FACTS ...........................................5

    A.   The Disputed Emails Are Composed In Response To Market Monitor Inquiries And The Commission's Subsequent Non-Public Investigation ...........................................................5

    B.   JPMVEC Cooperates With The Commission's Document Requests, But Withholds The Twenty-Five Disputed Emails......................................9

    C.   The Commission Petitions The District Court, And In The Process Reveals The Existence Of Its Non-Public Investigation.........................11

    D.   Following *In Camera* Review, The District Court Finds The Disputed Emails Privileged........................................................12

SUMMARY OF THE ARGUMENT ..................................................15

STANDARD OF REVIEW ........................................................18

ARGUMENT ...................................................................19

    I.   The Commission's Criticisms Of The District Court Are Meritless And Irrelevant...........................................................19

        A.   The District Court Was Not Required To Include Individualized Findings For Each Email In Its Opinion .............................21

        B.   The Commission Mischaracterizes The District Court's Opinion................................................................22

        C.   The District Court Did Not Issue A Ruling With "No Basis" In The Record ...........................................................23

    II.   Emails "Merely" Copied To Attorneys Fall Within The Attorney-Client Privilege.........................................................25

**PUBLIC COPY – SEALED MATERIAL DELETED**

A.   The Attorney-Client Privilege Does Not Turn On A Sender's Choice To Place An Attorney In The "To" Field Of An Email.........25

B.   The District Court Had Ample Competent Evidence From Which It Could Determine That Attorneys Were Copied On The Emails To Solicit Legal Advice.................................................28

III. Emails Between Non-Legal Corporate Personnel Fall Within The Attorney-Client Privilege ............................................................34

A.   The Privilege Shields Communications Preparing To Solicit Legal Advice Within A Corporate Client ...........................................35

B.   The Privilege Shields Communications Relaying And Discussing Legal Advice Within A Corporate Client........................38

IV. The District Court Did Not Abuse Its Discretion By Finding The Emails Privileged ......................................................................42

A.   The Emails Must Be Viewed In Context As Part Of A Broader Conversation About The Legal Response To The Investigation ........42

B.   The Emails Solicit, Prepare To Solicit, Relay, Or Discuss Legal Advice Within A Limited Group Of Corporate Personnel .................46

CONCLUSION .......................................................................55

**PUBLIC COPY – SEALED MATERIAL DELETED**

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page**

*Alexander v. FBI*,
    186 F.R.D. 102 (D.D.C. 1998) .............................................................. 24, 28

*Alexander v. FBI*,
    192 F.R.D. 42 (D.D.C. 2000) ................................................................ 24, 28

*Amobi v. Dist. of Columbia Dep't of Corr.*,
    262 F.R.D. 45 (D.D.C. 2009) ...................................................................13

*Anderson v. City of Bessemer*,
    470 U.S. 564 (1985)................................................................................ 3, 18

*Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*,
    No. C 06-3717, 2011 WL 1158781 (N.D. Cal. Mar. 29, 2011) .....................26

*Banks v. Office of Senate Sergeant-at-Arms*,
    228 F.R.D. 24 (D.D.C. 2005) ...................................................................29

*Brinton v. Dep't of State*,
    636 F.2d 600 (D.C. Cir. 1980).................................................................38

*Burlington Indus. v. Exxon Corp.*,
    65 F.R.D. 26 (D. Md. 1974) ....................................................................29

*Carter v. Cornell Univ.*,
    173 F.R.D. 92 (S.D.N.Y. 1997)................................................................37

\* *Coastal States Gas Corp. v. Dep't of Energy*,
    617 F.2d 854 (D.C. Cir. 1980)............................................................ 2, 15, 39

*Coleman v. Am. Broad. Cos.*,
    106 F.R.D. 201 (D.D.C. 1985) .............................................................. 32, 33

*Covington & Burling v. Food & Nutrition Serv.*,
    744 F. Supp. 314 (D.D.C. 1990)...............................................................47

*Dunlap Corp. v. Deering Miliken, Inc.*,
    397 F. Supp. 1146 (D.S.C. 1974) ..............................................................39

*Evans v. Atwood*,
    177 F.R.D. 1 (D.D.C. 1997) ......................................................................36

*Faloney v. Wachovia Bank, N.A.*,
    254 F.R.D. 204 (E.D. Pa. 2008) ........................................................... 33, 41

PUBLIC COPY – SEALED MATERIAL DELETED

*FTC v. Boehringer Ingelheim Pharms., Inc.*,
  286 F.R.D. 101 (D.D.C. 2012) ...................................................................40

* *FTC v. GlaxoSmithKline*,
  294 F.3d 141 (D.C. Cir. 2002) ............................................................ 39, 47

*Harrington v. Richter*,
  131 S. Ct. 770 (2011) ..............................................................................22

*Harrisburg Auth. v. CIT Capital USA, Inc.*,
  716 F. Supp. 2d 380 (M.D. Pa. 2010) .......................................................43

*Hercules Inc. v. Exxon Corp.*,
  434 F. Supp. 136 (D. Del. 1977) ..............................................................29

*Heriot v. Byrne*,
  257 F.R.D. 645 (N.D. Ill. 2009) ...............................................................34

*Howell v. Joffe*,
  483 F. Supp. 2d 659 (N.D. Ill. 2007) ........................................................43

*In re County of Erie*,
  473 F.3d 413 (2d Cir. 2007) ............................................................... 32, 44

* *In re Ford Motor Co.*,
  110 F.3d 954 (3d Cir. 1997) ................................................. 33, 41, 49, 51

*In re Fujiyama*,
  83 B.R. 739 (D. Haw. 1988) .....................................................................40

*In re Grand Jury 90-1*,
  758 F. Supp. 1441 (D. Colo. 1991) ..................................................... 23, 40

*In re Lindsey*,
  158 F.3d 1263 (D.C. Cir. 1998) ...............................................................35

*In re N.Y. Renu With Moistureloc Prod. Liab. Litig.*,
  No. MDL 1785 WL 2338552
  (D.S.C. May 8, 2008) ............................................. 26, 30, 31, 33, 36, 37, 47

*In re OM Grp. Secs. Litig.*,
  226 F.R.D. 579 (N.D. Ohio 2005) .............................................................32

*In re PEPCO Emp't Litig.*,
  Civ. A. No. 86-0603, 1992 WL 310781 (D.D.C. Oct. 2, 1992) ....................40

*In re Sealed Case*,
  121 F.3d 729 (D.C. Cir. 1997) .................................................................21

PUBLIC COPY – SEALED MATERIAL DELETED

*In re Sealed Case*,
    146 F.3d 881 (D.C. Cir. 1998) .......................................................................18

*In re Sealed Case*,
    737 F.2d 94 (D.C. Cir. 1984) ......................................... 18, 29, 38, 43

*In re Spalding Sports Worldwide, Inc.*,
    203 F.3d 800 (Fed. Cir. 2000) .......................................................29

*Jack Winter, Inc. v. Koratron Co.*,
    54 F.R.D. 44 (N.D. Cal. 1971) ......................................... 29, 30, 42

*Judicial Watch, Inc. v. U.S. Dept. of Homeland Sec.*,
    841 F. Supp. 2d 142 (D.D.C. 2012) .............................................13

*Loftin v. Bande*,
    258 F.R.D. 31 (D.D.C. 2009) ........................................................38

*McCook Metals L.L.C. v. Alcoa Inc.*,
    192 F.R.D. 242 (N.D. Ill. 2000) ...................................................39

\* *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*,
    566 F.2d 242 (D.C. Cir. 1977) ......................................................2

*Mineba Co. v. Papst*,
    228 F.R.D. 13 (D.D.C. 2005) ........................................................37

*Mohawk Indus., Inc. v. Carpenter*,
    558 U.S. 100 (2009) ......................................................................33

*Motley v. Marathon Oil Co.*,
    71 F.3d 1547 (10th Cir. 1995) ......................................................31

*Muro v. Target Corp.*,
    250 F.R.D. 350 (N.D. Ill. 2007), *aff'd*, 580 F.3d 485 (7th Cir. 2009) ..... 44, 54

*Preferred Care Partners Holding Corp. v. Humana, Inc.*,
    258 F.R.D. 684 (S.D. Fla. 2009) ..................................................40

*S.E.C. v. Wyly*,
    10 CIV. 5760 SAS, 2011 WL 3851129 (S.D.N.Y. June 17, 2011) ...............36

*SCM Corp. v. Xerox Corp.*,
    70 F.R.D. 508 (D. Conn. 1976) ....................................................40

*Se. Penn. Transp. Auth. v. Caremarkpcs Health, L.P.*,
    254 F.R.D. 253 (E.D. Pa. 2008) ...................................................40

*TransWeb, LLC v. 3M Innovative Props. Co.*,
    No. 10-cv-4113, 2012 WL 2878076 (D.N.J. Apr. 12, 2012) .........................37

PUBLIC COPY – SEALED MATERIAL DELETED

*U.S. Postal Serv. v. Phelps Dodge Ref. Corp.,*
    852 F. Supp. 156 (E.D.N.Y. 1994) ....................................................31

*United States v. AT&T Co.,*
    86 F.R.D. 603 (D.D.C. 1979) ................................................. 27, 29

*United States v. Beckham,*
    968 F.2d 47 (D.C. Cir. 1992)...........................................................25

*United States v. Chen,*
    99 F.3d 1495 (9th Cir. 1996) .........................................................32

*United States v. Chevron Texaco Corp.,*
    241 F. Supp. 2d 1065 (N.D.Cal.2002)............................... 32, 36, 44

*United States v. Evans,*
    113 F.3d 1457 (7th Cir. 1997) .......................................................18

*United States v. ISS Marine Servs. Inc.,*
    No. 12-481, 2012 WL 5873682 (D.D.C. Nov. 21, 2012)...............13

*United States v. Kovel,*
    296 F.2d 918 (2d Cir. 1961) ...........................................................35

\* *Upjohn Co. v. United States,*
    449 U.S. 383 (1981)..................................................... 15, 34, 47

*Walker v. Washington,*
    627 F.2d 541 (D.C. Cir. 1980)........................................................22

*Wilstein v. San Tropai Condo. Master Ass'n,*
    189 F.R.D. 371 (N.D. Ill. 1999) .....................................................39


**Rules**

18 C.F.R. § 1b.9 ..................................................................................1

Fed. R. Civ. P. 52 ...............................................................................3

\* Proposed Fed. R. Evid. 503(b),
    *reprinted in* 56 F.R.D. 183, 236 (1972)........................................35


**Other Authorities**

*Enforcement of Statutes, Regulations, and Orders,*
    134 FERC ¶ 61,054 at P 17 (2011)................................................11

McCormick on Evidence (6th ed. 2006)..................................... 34, 38

Restatement (Third) of Law Governing Lawyers...............................35

PUBLIC COPY – SEALED MATERIAL DELETED

## GLOSSARY

| | |
|---|---|
| CAISO | The California Independent System Operator, the market operator for the California energy market |
| FERC Enforcement Staff | The enforcement staff of the Federal Energy Regulatory Commission |
| FERC or the Commission | The Federal Energy Regulatory Commission |
| JPMVEC or the Company | J.P. Morgan Ventures Energy Corporation |
| MISO | The Midwest Independent System Operator, the market operator for the Midwest energy market |

PUBLIC COPY – SEALED MATERIAL DELETED

# INTRODUCTION [1]

In the course of an ongoing, non-public investigation by the Federal Energy Regulatory Commission ("FERC" or "the Commission"), J.P. Morgan Ventures Energy Corporation ("JPMVEC" or "the Company") has produced more than 700,000 pages of documents.  This appeal involves twenty-five emails that JPMVEC has withheld on the basis of attorney-client privilege.

All twenty-five emails were transmitted as part of the Company's legal response to the investigation, either in anticipation of the investigation, or in response to developments in the investigation itself.  The earliest was sent *after* JPMVEC was contacted by market monitors who were investigating the relevant bidding practices to determine whether they ought to be referred to the Commission.  Attorneys are included on over half of the emails, and unredacted portions of the emails refer to attorneys responsible for the investigation, reference "conversation[s]" with those attorneys, state that those attorneys "advised," state that "outside counsel asked," or declare outright, "I ask Compliance and Legal."  Given the time frame and subject matter of the emails, the only conceivable motivation for the Commission to seek access to the emails—other than to pressure JPMVEC by

---

[1]  JPMVEC has redacted certain information in its brief in an effort to preserve confidential information in a non-public investigation pursuant to 18 C.F.R. § 1b.9.

**PUBLIC COPY – SEALED MATERIAL DELETED**

publicly disclosing details of this supposedly "non-public" investigation—is to peer into the details of JPMVEC's legal strategy.

The Commission, seeking to justify its decision to pursue this litigation, explains that it views JPMVEC's claim of privilege with suspicion because no attorneys are listed as recipients in the "to" fields of the emails. In its view, such emails are "generally" not privileged. But JPMVEC has never suggested otherwise; to the contrary, this dispute involves a mere twenty-five emails withheld in the course of producing hundreds of thousands of pages of such non-privileged emails.

As the Commission acknowledges, an email need not *always* list an attorney in its "to" field to be protected by the privilege. An attorney may be "cc'd" to solicit legal advice. And, even emails solely between business personnel may be protected—for instance, where emails circulate legal advice within a limited group of corporate personnel. This Court has explained, "[w]hen the client is by nature a group, as is true of both the government and corporations, the courts have agreed that the privilege should not be defeated by some limited circulation beyond the attorney and the person within the group who requested the advice." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 863 (D.C. Cir. 1980) (citing *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 253 n.24 (D.C. Cir. 1977)) (emphasis omitted).

PUBLIC COPY – SEALED MATERIAL DELETED

Confident that the twenty-five disputed emails are, in fact, shielded by the privilege, JPMVEC voluntarily provided the emails—together with a declaration by JPMVEC's outside counsel for the investigation—for *in camera* inspection. And the district court agreed:  The "redactions are of communications between [JPMVEC] and its counsel, acting as counsel, with respect to legal advice relating to facts communicated confidentially to counsel by [JPMVEC]." JA-404.[2]  In other words, the redactions are necessary to prevent disclosure of the details of JPMVEC's privileged communications with its attorneys because they implicitly or explicitly reveal the content of communications between the corporate client and its counsel even if they are not all addressed to attorneys.

That conclusion is reviewed for abuse of discretion, notwithstanding the Commission's assertion that this Court "is equally well positioned as the Magistrate Judge to resolve the matter" because the ruling was based "on a paper record" (Op. Br. 20)—a proposition that, if true, would eviscerate deferential review in all matters that do not turn on credibility.  *See Anderson v. City of Bessemer*, 470 U.S. 564, 574-75 (1985) (rejecting analogous argument under Fed. R. Civ. P. 52).  Nor can the Commission escape deferential review because it wishes the district court had written a longer opinion.  It was well within the district court's discretion to

---

[2]  Citations to "JA" refer to the Joint Appendix filed on February 20, 2013, whereas citations to "SA" refer to the *Ex Parte* Supplemental Appendix for *In Camera* Review submitted on March 18, 2013.

**PUBLIC COPY – SEALED MATERIAL DELETED**

reject the Commission's claims in a summary fashion; if anything, its opinion indicates only that it found little merit to the Commission's arguments.

Still, mindful that deferential review is nonetheless review, JPMVEC has again voluntarily provided the emails for *in camera* inspection.[3]  Because this Court's own examination should confirm that the district court did not remotely abuse its discretion, the judgment of the district court should be affirmed.

## COUNTER-STATEMENT OF THE ISSUES

Did the district court abuse its discretion when it concluded, following briefing, argument, and *in camera* review, that the disputed emails are shielded from disclosure by the attorney-client privilege?

## PERTINENT STATUTORY AND REGULATORY PROVISIONS

The pertinent statutory and regulatory provisions are reproduced in the Addendum to the Opening Brief.

---

[3]  The emails are reproduced as Exhibits A-L to the declaration of Catherine Krupka, submitted via the *Ex Parte* Supplemental Appendix.  For the Court's convenience, redacted text that the Commission seeks to have produced is highlighted in yellow, whereas redacted text that has not been challenged by the Commission in this action is highlighted in green.

**PUBLIC COPY – SEALED MATERIAL DELETED**

## COUNTER-STATEMENT OF THE FACTS

**A.    The Disputed Emails Are Composed In Response To Market Monitor Inquiries And The Commission's Subsequent Non-Public Investigation**

This appeal arises out of a non-public investigation by FERC's Office of Enforcement into bidding practices in the California and Midwest energy markets. The twenty-five disputed emails were composed and sent either in the context of the Commission's investigation itself, or in anticipation of that investigation, after the market monitor inquiries that led to it.

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████    JA-232-33 ¶ 3; SA-1-2 ¶ 3.  The first of the disputed emails was sent four days later, and its unredacted subject line makes clear that it pertains to JPMVEC's "Proposed Response" to the "MISO IMM," *i.e.* the MISO market monitor.  JA-251; SA-20 (FERC Item 1).  The email forwards an attachment that includes advice of counsel, and the email itself is meaningful only when read in conjunction with that attachment.  The second disputed email was sent later that same day, and the subject line states that it pertains to a "[f]ollow up meeting with Midwest ISO Market Monitor."  JA-255; SA-23 (FERC Item 2).  The unredacted portion of the email mentions "Diane"—a reference to JPMVEC's in-house counsel Diane Genova.

5

PUBLIC COPY – SEALED MATERIAL DELETED

On March 3, 2011, the market monitor for the California Independent System Operation ("CAISO") commenced an inquiry into JPMVEC's bidding practices in the California markets.  JA-233 ¶ 4; SA-2 ¶ 4.  The third disputed email was sent eight days later, and its subject line—"Privileged and Confidential – CAISO update"—indicated that it pertained to that inquiry.  JA-259; SA-26 (FERC Item 4).[4]  Unredacted portions of the email include the words "spoke to Catherine Krupka," outside counsel for the investigation, and "[s]he advised."  The fourth disputed email was sent as a reply to that email, and was copied to both in-house and outside counsel; in it, a business officer solicited further legal advice in connection with the investigation.  JA-259; SA-26 (FERC Item 3).

The next four emails were generated over the following three days, and were all sent as part of the same email chain.  JA-258, 271-72; SA-25, 34-35 (FERC Items 5-8).  Each of these emails had at the bottom the email forwarding Catherine Krupka's advice and containing the unredacted words "spoke to Catherine Krupka" and "she advised."  The emails, sent between business personnel, dis-

---

[4]  The Commission's numbering of the emails as "Items" does not always list the emails in chronological order.  Thus, for instance, this summary discusses "Item 4" before "Item 3."

 The order in which the emails were sent may be discerned from the order in which they appear in the email chains.  Notably, because the emails were sent and received in different time zones, the "time stamps" on the emails may sometimes indicate that an earlier email was sent *after* a subsequent email, or vice versa.

PUBLIC COPY – SEALED MATERIAL DELETED

cussed legal advice provided in connection with the investigation and prepared to solicit further legal advice.

The ninth and tenth disputed emails were sent on May 7, 2011, less than two weeks before the California market monitor concluded its preliminary inquiry by referring JPMVEC to FERC's Enforcement Staff—a referral that JPMVEC had already been told was imminent.  The ninth email had as its subject "Update" and provided information regarding the inquiry to a group of recipients that included in-house counsel Diane Genova.  JA-277-78; SA-39-40 (FERC Item 10).  The tenth email was sent as a reply to the same group (including Diane Genova); it followed up by requesting legal advice.  JA-277; SA-39 (FERC Item 9).

Eight emails were sent over the course of the subsequent two-week period leading up to the California market monitor's decision to refer JPMVEC to FERC Enforcement Staff.  The eleventh disputed email, sent between two compliance officers, references "Catherine's conversation," meaning a conversation with outside counsel Catherine Krupka.  JA-280; SA-41 (FERC Item 11).  The twelfth through fifteenth emails were exchanged between compliance personnel and pertained to the collection of information for provision to outside counsel, undertaken at outside counsel's direction.  JA-282; SA-42 (FERC Items 12-15).  Finally, the sixteenth, seventeenth, and eighteenth emails were sent on May 18 and 19, just days before the California market monitor referred JPMVEC to FERC Enforcement

**PUBLIC COPY – SEALED MATERIAL DELETED**

Staff—a referral which, again, JPMVEC had been told was imminent.  JA-285, 288;  SA-44, 46 (FERC Items 16-18).  The subject lines of these emails ("FERC Meeting" and "FERC meeting list attendees"), as well as unredacted emails in the same email chains, make clear that the redacted emails pertain to a meeting with FERC personnel in connection with the investigation; in-house counsel was copied to solicit legal advice.

On June 23, 2011, the California system operator filed with the Commission a set of proposed amendments to its tariff intended to respond to the bidding strategies at issue in the investigation.  The nineteenth disputed email was sent that same day; it was copied to in-house counsel and asks that "someone prepare" a further document in connection with the investigation.  JA-291; SA-48 (FERC Item 19).

The Commission propounded its first set of discovery requests in connection with the investigation on June 29, 2011.  The twentieth disputed email was sent less than two weeks later, on July 5, 2011, and states that it is "in connection with document retention."  JA-294; SA-50 (FERC Item 23).  The next three disputed emails were all sent in reply to that email; the unredacted portion of one of these replies contains the words "outside counsel asked."  JA-294; SA-50 (FERC Items 20-22).

PUBLIC COPY – SEALED MATERIAL DELETED

Finally, the twenty-fourth and twenty-fifth disputed emails were sent on July 15, 2011.  The twenty-fourth was sent by a business officer to compliance personnel and asks those personnel to seek advice from counsel; the unredacted portion of the email includes the words "I ask Compliance and Legal."  JA-296; SA-51 (FERC Item 25).  The twenty-fifth email was sent in reply to that request, and broadens the list of recipients to include both in-house counsel Diane Genova and outside counsel Catherine Krupka.  JA-296; SA-51 (FERC Item 24).  By broadening the list of recipients to include those attorneys, this final email implicitly solicited those attorneys' legal advice on the question raised in the prior, twenty-fourth disputed email.

## B.    JPMVEC Cooperates With The Commission's Document Requests, But Withholds The Twenty-Five Disputed Emails

Over the course of the Commission's investigation, JPMVEC has produced more than 700,000 pages of documents.  This enormous production of documents has occurred (and is still occurring) on a rolling basis.

Counsel for JPMVEC did not review all of the documents relevant to FERC's requests on a single occasion, but rather reviewed the documents as they were collected, with an eye towards providing as expeditious a response as possible to the Commission.  JA-234-35 ¶¶ 9, 10; SA-3-4 ¶¶ 9, 10.  In order to ensure that JPMVEC did not waive applicable privileges, certain documents were provisionally withheld when counsel was unable to ascertain, based on the incomplete

9

**PUBLIC COPY – SEALED MATERIAL DELETED**

information available at the time, whether the documents were indeed privileged. JA-234 ¶ 8; SA-3 ¶ 8.  For example, JPMVEC was particularly careful when producing emails involving compliance personnel who work closely with or at the direction of attorneys.  JA-234 ¶ 9; SA-3 ¶ 9.

JPMVEC also initially withheld emails that appeared in email chains with other emails whose contents JPMVEC believed were subject to a valid claim of privilege, out of concern that revealing even a portion of the email chain could waive a claim of privilege as to the entire subject matter of that chain.  JA-236-37 ¶ 18; SA-5-6 ¶ 18; *see also* JA-153.  Respondent sought to confer with the Enforcement Staff regarding this and other issues, and these requests were initially denied.  JA-236 ¶ 16; SA-5 ¶ 16.

In the midst of this ongoing, rolling document production, on April 18, 2012 and May 3, 2012, the Commission issued subpoenas *duces tecum* demanding that JPMVEC produce unredacted versions of fifty-eight emails.  JA-172-205.  Counsel for JPMVEC, in response, suggested that the parties confer by telephone; all communications on this issue had, until that point, been conducted via email.  JA-147. The Commission responded that it did not "see any value in additional discussions," but later agreed to confer.  JA-148, 151.

Telephone discussions proved productive, as the Commission agreed not to assert subject matter waiver if JPMVEC disclosed only portions of email chains.

10

PUBLIC COPY – SEALED MATERIAL DELETED

JA-153, 154.  In light of that assurance, and in light of JPMVEC's ongoing review as part of its rolling production, JPMVEC produced in unredacted form twenty-eight of the emails sought by the Commission.  JA-157-58, 171.[5]  JPMVEC, how-ever, continued to assert privilege over the remaining twenty-five emails, and pro-vided the Commission with a privilege log supporting its claim of privilege.  JA-157-58, 160-62.

## C.  The Commission Petitions The District Court, And In The Process Reveals The Existence Of Its Non-Public Investigation

The Commission petitioned the district court on July 2, 2012, seeking judi-cial enforcement of its subpoenas.  JA-6.  Although the investigation was (and still is) non-public, the Commission publicly filed its petition, thereby publicly disclos-ing the existence of this confidential administrative investigation.[6]

The Commission's supporting memorandum focused in large part on the twenty-eight emails that JPMVEC had *already* disclosed, rather than the twenty-five emails that JPMVEC continued to withhold.  Since "JP Morgan has knowingly

---

[5]  JPMVEC produced twenty emails on May 9, 2012, and produced an additional eight emails on June 4, 2012.

[6]  The Commission has stated that, in the ordinary course, "the subject's identity, and indeed the very existence of an investigation, will continue to remain confiden-tial throughout the investigative process," as a notice of violation disclosing that information will issue "only after the investigation is completed."  *Enforcement of Statutes, Regulations, and Orders*, 134 FERC ¶ 61,054 at P 17 (2011).  There is no reason why the Commission should make an exception to that ordinary procedure when it seeks to enforce a subpoena, particularly as courts have the means to keep the existence of the investigation confidential.

11

PUBLIC COPY – SEALED MATERIAL DELETED

advanced privilege claims in 28 obviously non-privileged emails," the Commission argued, "there is no reason to credit its privilege claims in the remaining 25."  JA-32.  The Commission also argued that the disputed emails were "likely" not privileged because they were not addressed to attorneys.  JA-38.

JPMVEC voluntarily submitted the disputed emails for *in camera* review, and provided an affidavit setting out the context in which the emails were drafted. JPMVEC's response to the Commission's memorandum separately addressed each of the relevant email chains, explaining in detail the basis for its claim of privilege. JA-223-29.

The parties consented to have the case heard by a magistrate, and as a result the case was assigned to Magistrate Judge Deborah A. Robinson.  JA-2.

## D. Following *In Camera* Review, The District Court Finds The Disputed Emails Privileged

After holding a public hearing—at which the Commission again unnecessarily revealed confidential information about the investigation, JA-379—and reviewing the documents *in camera*, the district court on November 29, 2012, denied the Commission's petition to enforce its subpoena.  JA-400.[7]  The court's memo-

---

[7] The Magistrate Judge instructed the Commission at the outset of the public hearing that "[m]y purpose is not to inquire into the investigation which I understand is a non-public investigation[,]" but the Commission nonetheless publicly disclosed the identity of individuals to be deposed in connection with the investigation.  JA-367, 379.

**PUBLIC COPY – SEALED MATERIAL DELETED**

randum opinion discussed the applicable legal standard at some length.  The court

quoted the standard four-factor test for the attorney-client privilege:

> (1) the holder of the privilege is, or sought to be, a client; (2) the person to whom the communication is made is a member of the bar or his subordinate and, in connection with the communication at issue, is acting in his or her capacity as a lawyer; (3) the communication relates to a fact of which the attorney was informed by his client, outside the presence of strangers, for the purpose of securing legal advice; and (4) the privilege has been claimed by the client.

JA-402 (quoting *Judicial Watch, Inc. v. U.S. Dept. of Homeland Sec.*, 841 F. Supp.

2d 142, 153-54 (D.D.C. 2012)).  The court explained that communications from

attorney to client are protected if "based on confidential information provided by

the client[ ]."  JA-403 (quoting *Amobi v. Dist. of Columbia Dep't of Corr.*, 262

F.R.D. 45, 51 (D.D.C. 2009)) (alteration in original).  And the court observed that,

"[t]o be privileged, a communication must be for the purpose of securing *primarily*

either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal

proceeding."  JA-402 (quoting *United States v. ISS Marine Servs. Inc.*, No. 12-481,

2012 WL 5873682, at *5 (D.D.C. Nov. 21, 2012) (internal quotation marks omit-

ted)).

The district court also explained that "[c]omplications in the application of

the privilege arise when the client is a corporation."  JA-403 (quoting *ISS Marine*

*Servs.*, 2012 WL 5873682, at *4).  The district court continued: "[I]n the corporate

context, the privilege applies so long as '[t]he communications at issue were made

PUBLIC COPY – SEALED MATERIAL DELETED

by [company] employees to counsel for [the company] acting as such, at the direction of corporate superiors in order to secure legal advice from counsel.'" *Id.* And, "the privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Id.*

Following this recitation of the law, the district court set out the result of its *in camera* review:

> Having completed the *in camera* review in the context of the applicable authorities, the undersigned finds that [JPMVEC] has demonstrated, in accordance with the law of this Circuit . . . that the information redacted indeed is shielded from disclosure by the attorney-client privilege. More specifically, the court finds that the redactions are of communications between [JPMVEC] and its counsel, acting as counsel, with respect to legal advice relating to facts communicated confidentially to counsel by [JPMVEC].

JA-404 (citation omitted). Turning to the Commission's "principal[ ]" argument in support of its petition, the district court rejected the suggestion that "because [JPMVEC] claimed the privilege with respect to some documents which it later produced, the court should view the claim of privilege as to the redacted portions still being withheld with suspicion." *Id.* That approach, the court observed, "would effectively penalize counsel for voluntarily revisiting the basis for withholding documents." JA-405. The court emphasized that it was not blindly relying on JPMVEC's assertion of privilege; rather, *in camera* inspection had confirmed that "the redactions are consistent with the proffered explanation." *Id.*

14

PUBLIC COPY – SEALED MATERIAL DELETED

The Commission filed its notice of appeal on January 11, 2013.  On February 5, 2013, this Court granted the Commission's motion to expedite.[8]

## SUMMARY OF THE ARGUMENT

"The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law."  *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).  It "reflects society's judgment that promotion of trust and honesty within the [attorney-client] relationship is more important than the burden placed on the discovery of truth," and it "extends to all situations in which an attorney's counsel is sought on a legal matter."  *Coastal States Gas Corp.*, 617 F.2d at 862.  The district court properly applied the privilege to deny enforcement of the Commission's subpoena.

**1.**  The Commission devotes a substantial portion of its brief to misguided attacks on the manner in which the district court reached and expressed its conclusion.  The Commission claims the court's opinion should have included individualized findings for each email, but there is no such requirement that it do so.  And the court specifically addressed the categorical arguments that the Commission itself emphasized below (even if the Commission has chosen to emphasize different arguments on appeal).  If anything, the district court's brevity indicates only that it

---

[8]  In the publicly-filed version of its opening brief before this Court, the Commission once again disclosed additional confidential details about this "non-public" investigation. *See*, *e.g.*, Op. Br. 6-7.

**PUBLIC COPY – SEALED MATERIAL DELETED**

concluded that the Commission's challenge lacked even apparent merit. The Commission also claims the district court reached a factual conclusion that cannot be squared with the undisputed facts, but the Commission does so on the basis of a cramped and implausible reading of the opinion's language. And, finally, the Commission suggests the district court lacked an evidentiary "basis" for its finding of privilege for two emails, even though the district court had those emails before it *in camera*. Certainly, these criticisms provide no justification to (as the Commission suggests) depart from the generally-applicable abuse-of-discretion standard of review.

    **2.** The Commission repeatedly points out that thirteen of the emails are "merely" copied to attorneys. Yet the Commission fails to explain exactly how that fact is significant. The Commission concedes that such emails can be privileged. *See* Op. Br. 29 n.13. And, indeed, the decision to place an attorney in the "to" or "cc" field of an email is generally a matter of convenience, particularly when an email is generated as a "reply all."

    The Commission's argument with respect to these emails boils down to an assertion that JPMVEC failed to provide "competent evidence" demonstrating that attorneys were copied on the emails in order to solicit legal advice. But that is simply not true: JPMVEC provided the emails themselves for *in camera* inspection, and the purpose of the emails is clear from their face. The purpose of the

16

**PUBLIC COPY – SEALED MATERIAL DELETED**

emails may also be discerned from the context in which they were sent.  Because the investigation (and related market monitor inquiries) loomed large over all the communications, it is evident that attorneys were copied to solicit legal advice in connection with the investigation.  Magistrate Judge Robinson had no trouble reaching that conclusion after her *in camera* review, and nothing that the Commission argues remotely shows that she abused her discretion in so concluding.

**3.**  Turning next to the twelve emails that were sent only to non-legal personnel, the Commission argues that such emails are "generally" not privileged.  Op. Br. 22.  JPMVEC does not dispute this point and has released hundreds of thousands of emails between non-lawyers in the course of the investigation.

But courts recognize that emails between non-lawyers may be privileged in a variety of situations—certain of which apply to the twelve withheld here.  Corporate personnel may prepare to solicit legal advice, for instance by discussing questions they intend to ask or by coordinating to gather information to provide to an attorney; and, corporate personnel may relay legal advice to others within the corporate client, and in doing so may discuss the advice amongst themselves.  If such communications were *not* privileged, a corporation could not meaningfully solicit or act on legal advice, as corporations are by their nature collective entities and must collaborate to make and carry out decisions.  Application of the privilege to

**PUBLIC COPY – SEALED MATERIAL DELETED**

such communications merely "translates" the doctrine from the paradigmatic individual client to the corporate context.

**4.**  The district court did not remotely abuse its discretion when it applied the foregoing legal principles—the bulk of which the parties do not dispute—to conclude that the disputed emails fall within the privilege.  That determination was properly made viewing the emails in the context in which they were made, as part of a broader conversation within the corporate client regarding the proper response to an investigation.  Viewed in that context, the emails on their face solicit, prepare to solicit, relay, or discuss legal advice within a limited group of corporate personnel, and are therefore within the scope of the attorney-client privilege.

## STANDARD OF REVIEW

District court decisions enforcing or declining to enforce subpoenas are reviewed for arbitrariness or abuse of discretion.  *See In re Sealed Case*, 146 F.3d 881, 883 (D.C. Cir. 1998).  Thus, the district court's factual findings will not be disturbed unless clearly erroneous.  *United States v. Evans*, 113 F.3d 1457, 1461 (7th Cir. 1997); *see also In re Sealed Case*, 737 F.2d 94, 101 (D.C. Cir. 1984).  "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."  *Anderson*, 470 U.S. at 574.

**PUBLIC COPY – SEALED MATERIAL DELETED**

## ARGUMENT

## I.    The Commission's Criticisms Of The District Court Are Meritless And Irrelevant

The Commission attempts at the outset to evade the applicable—and deferential—standard of review by effectively contending that the district court did not merely err in doing its job, but did not do its job at all.  As the Commission sees it, the district court should have written an email-by-email analysis, and its reasoning amounts to a "blanket ruling," Op. Br. 14, that either "cannot be squared with the undisputed facts," *id.* at 15, or has "no basis" in the record, *id.* at 19.  In the Commission's view, in light of these concerns, "no deference to the Magistrate Judge's order is appropriate."  *Id.* at 15.

These assertions are, if nothing else, daring, as the district court's decision was structured to address the arguments that the Commission itself advanced.  The Commission's primary argument below was a "blanket" argument:  The Commission contended that the district court should reject JPMVEC's privilege claims *en masse* because JPMVEC had produced *other* emails after initially claiming privilege as to them.  JA-25, 298-310, 321.  Although the Commission also suggested, as it does here, that the emails should be held non-privileged based on the presence or absence of an attorney in the "to" or "cc" fields, that was offered as an additional blanket reason the entire selection of emails was "likely" not privileged.  JA-38.

**PUBLIC COPY – SEALED MATERIAL DELETED**

The district court's opinion squarely addressed the arguments advanced by the Commission.  The district court considered at length the Commission's "principal[ ]" argument, ultimately declining to "penalize counsel for voluntarily revisiting the basis for withholding documents."  JA-404-05.  And, after JPMVEC voluntarily offered the emails for *in camera* review, the district court undertook *in camera* review and concluded the emails are privileged.  Notwithstanding the Commission's argument that attorneys did not appear in the "to" fields of the emails, the district court found the redactions necessary to prevent disclosure of communications between JPMVEC and its attorneys because—as JPMVEC argued—the emails *reflect* those communications; in the district court's words, "the redactions are of communications between [JPMVEC] and its counsel, acting as counsel, with respect to legal advice relating to facts communicated confidentially to counsel by [JPMVEC]."  JA-404.

Although the Commission has shifted the terrain on appeal—including by abandoning its principal, credibility-based argument—the Commission cannot complain about the fact that the district court structured its decision to address the arguments the Commission itself was making at that time.  To the contrary, none of the arguments advanced by the Commission provides any basis to depart from the abuse of discretion standard of review.

PUBLIC COPY – SEALED MATERIAL DELETED

### A.    The District Court Was Not Required To Include Individualized Findings For Each Email In Its Opinion

The Commission takes issue with the district court's decision to issue a "blanket ruling, with no individualized discussion of the documents."  Op. Br. 14-15 (quoting *In re Sealed Case*, 121 F.3d 729, 740 (D.C. Cir. 1997) (per curiam)). But a district court resolving a privilege dispute after *in camera* review is not required to issue an opinion separately addressing every disputed communication.

Indeed, the opinion from which the Commission quotes the phrase "blanket ruling" disclaims any such requirement.  This Court stated:  "Since the district court reviewed the withheld documents *in camera* before denying the [agency's] motion to compel, the absence of detailed findings would *not*, on its own, preclude us from according our usual deference to the district court's opinion."  *In re Sealed Case*, 121 F.3d at 740 (emphasis added).  Because the district court in this case likewise inspected the emails *in camera*, the "absence of detailed findings" does not "preclude [this Court] from according [its] usual deference."

It is true that the Court in *In re Sealed Case* declined to defer to the district court's opinion, but it did so for two reasons with no application here.  First, the case presented a novel legal question regarding the scope of the Presidential privilege—an issue of considerable import to the separation of powers.  121 F.3d at 740.  And, second, the district court failed even to address a claim of waiver advanced by the parties.  *Id.*  Here, by contrast, the district court discussed the gov-

PUBLIC COPY – SEALED MATERIAL DELETED

erning legal standard, took particular care to consider the "principal[ ]" legal claim advanced by the Commission and, after *in camera* review, rejected the Commission's argument based on the absence of attorneys in the "to" fields of the emails.

The Commission evidently wishes the district court had written a longer opinion addressing email-specific issues it either did not raise, or raised only passingly, before the district court. But the district court was not required to specifically address every sub-issue the parties could or might raise; to the contrary, this Court has explained that summary action is appropriate where "the merits of [a] claim are . . . clear." *Walker v. Washington*, 627 F.2d 541, 545 (D.C. Cir. 1980) (per curiam); *see also Harrington v. Richter*, 131 S. Ct. 770, 784 (2011) (summary dispositions enable a court "to concentrate its resources on the cases where opinions are most needed"). The district court's summary action indicates that—to the extent the Commission's email-specific arguments were even properly presented—the district court correctly found them without merit.

**B.     The Commission Mischaracterizes The District Court's Opinion**

The Commission also contends the language employed by the district court "cannot be squared with the undisputed facts." Op. Br. 15. Twelve of the twenty-five emails were sent between non-lawyers; that basic fact was reflected in both the parties' arguments. Yet the Commission reads the district court to conclude that *all* twenty-five emails were sent to attorneys. It is telling that the Commission

22

PUBLIC COPY – SEALED MATERIAL DELETED

must strain to mischaracterize the opinion below in order to attempt to put the district court in error.

JPMVEC acknowledged below that some of the communications at issue occurred between non-lawyers, but argued that (within a corporate client) such communications are privileged if "predicated on earlier advice of counsel" because they "reflect[ ] legal advice once removed."  JA-221 (quoting *In re Grand Jury 90-1*, 758 F. Supp. 1441 (D. Colo. 1991)).  In light of the arguments presented to the district court, its conclusion that "the redactions are of communications between [JPMVEC] and its counsel, acting as counsel," JA-404, naturally means that the redactions are "of" communications between the corporate client and its counsel because the emails *reflect* such communications even if they were not *themselves* sent to an attorney.  There is no reason to instead presume the district court so failed to do its job that it was not even aware of what the dispute was about.

## C.    The District Court Did Not Issue A Ruling With "No Basis" In The Record

Finally, the Commission contends the district court's decision is entitled to no deference because JPMVEC failed to "offer any justification whatsoever for its redactions of two of the at-issue emails."  Op. Br. 17.  In the Commission's view, the district court had "no basis" to find those emails privileged.  *Id.* at 19.

This claim is incorrect.  Both emails were provided *in camera*, and that alone provides ample "basis" for the opinion.  *See*, *e.g.*, *Alexander v. FBI*, 186

**PUBLIC COPY – SEALED MATERIAL DELETED**

F.R.D. 102, 107 (D.D.C. 1998) (*Alexander I*) ("Notwithstanding the inadequacy of these descriptions, the court's *in camera* inspection of these documents, as discussed below, permits a determination of whether the documents were properly withheld."); *see also Alexander v. FBI*, 192 F.R.D. 42, 46 (D.D.C. 2000) (*Alexander II*).

JPMVEC's ground for claiming privilege was also evident from its memorandum. JPMVEC explained that the first email (SA-20; Item 1) forwarded a document that "reflects the revisions and recommendations of outside counsel," JA-225; the email, taken together with its attachment, is privileged as a communication relaying legal advice. *See infra* 47-48. As for the second email (SA-44; Item 17), JPMVEC addressed at some length its basis for redacting another email within the same email chain. The same rationale applies equally to both: "The email is privileged because it pertains to earlier, privileged communications with counsel and reflects a request for additional legal advice." JA-227; *see infra* 52. And, JPMVEC informed the district court that *all* the disputed emails are privileged because they "solicit, provide, relay, or discuss legal advice." JA-222.

If the Commission truly believed these justifications were inadequate, it ought to have asserted that purported inadequacy before the district court, but it failed to do so, both in its reply memorandum and at the subsequent hearing. Thus, to the extent the Commission suggests JPMVEC has somehow waived its claim of

**PUBLIC COPY – SEALED MATERIAL DELETED**

privilege with respect to these emails—which it has not—the Commission has it-self waived its claim of waiver by not asserting it at all.  *See*, *e.g.*, *United States v. Beckham*, 968 F.2d 47, 54 n.5 (D.C. Cir. 1992) (finding government "waiv[ed] any waiver argument it may have had").

## II.    Emails "Merely" Copied To Attorneys Fall Within The Attorney-Client Privilege

In addition to leveling the foregoing criticisms at the district court, the Commission repeatedly trumpets the fact that thirteen of the twenty-five disputed emails were "merely" copied to attorneys.  *E.g.*, Op. Br. 2, 8, 13, 27.[9]  By this, the Commission means that attorneys received these emails, but did so because they were listed in the email's "cc" field rather than the "to" field.  The Commission's emphasis on this fact is misplaced:  Emails that are "merely" copied to attorneys are communications *with* those attorneys and accordingly may be shielded by the attorney-client privilege.

### A.    The Attorney-Client Privilege Does Not Turn On A Sender's Choice To Place An Attorney In The "To" Field Of An Email

Despite its repeated emphasis on the circumstance of whether an attorney was placed in the "to" or "cc" field, the Commission never explains why that cir-cumstance should be significant to a court's privilege determination.

---

[9]  Items 3, 4, 9, 10, 16, 17, 18, 19, 20, 21, 22, 23, and 24 were copied to attorneys.

PUBLIC COPY – SEALED MATERIAL DELETED

To the contrary, the Commission concedes that "emails copied to attorneys could, on their face, reflect a request for legal advice"—a request that would undoubtedly fall within the privilege. Op. Br. 29 n.13. The Commission maintains that a "cc" to an attorney does not "necessarily" render an email privileged, *id.* at 27, and JPMVEC has never disagreed. Indeed, JPMVEC has produced numerous emails copied to attorneys in the course of the investigation, but has withheld these *particular* emails because attorneys were copied in order to solicit legal advice.

The Commission fails to explain the significance of the distinction between the "to" and "cc" fields because the distinction generally is not meaningful. "Sending an email by 'cc' is usually a question of convenience rather than an expression of some intent to delineate priorities." *In re N.Y. Renu With Moistureloc Prod. Liab. Litig.*, No. MDL 1785, 2008 WL 2338552, at *10 (D.S.C. May 8, 2008); *see also Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, No. C 06-3717, 2011 WL 1158781, at *3 (N.D. Cal. Mar. 29, 2011) ("Although copying [an attorney] may not be sufficient to support the assertion of privilege, it also is not fatal to the assertion.").[10] This is particularly true when a sender hits "reply all" to

---

[10] Indeed, given that the privilege may attach to communications not addressed to attorneys at all, *see infra* 34, it would make little sense to draw a bright line between emails that list attorneys in the "to" or "cc" fields. *In re N.Y. Renu*, 2008 WL 2338552, at *10.

**PUBLIC COPY – SEALED MATERIAL DELETED**

a previous email, as most email programs in that circumstance will automatically preserve the "to" and "cc" designations from the prior email.

The email chain reproduced at Exhibit I (SA-46) illustrates the point. The first email in the chain (which has been voluntarily disclosed) provides a group of recipients with a list of attendees expected at an upcoming meeting with the Commission in connection with the investigation; business personnel are listed in the "to" field, and two lawyers are "cc'd." The next email (which has not been disclosed, and which the Commission seeks) was generated as a "reply all." The email program automatically retained the "to" and "cc" designations of the first email—meaning that the two attorneys appeared in the "cc" field—but the second email on its face solicits legal advice, as is clear from the redacted version of the email.

The Commission appears to be concerned that senders could "launder[ ]" emails through attorneys in order to shield them from disclosure. *United States v. AT&T Co.*, 86 F.R.D. 603, 620 (D.D.C. 1979). However, "the metaphor is inapt and the fear exaggerated, if the limitations on the privilege are kept in mind," *id.*, as JPMVEC has done in this investigation. Whether an email received by an attorney is shielded from disclosure turns upon application of the attorney-client privilege doctrine in light of all the facts and circumstances. There is no need to graft an artificial distinction between the "to" and "cc" fields onto that inquiry.

PUBLIC COPY – SEALED MATERIAL DELETED

B.    **The District Court Had Ample Competent Evidence From Which It Could Determine That Attorneys Were Copied On The Emails To Solicit Legal Advice**

Although the Commission concedes that emails copied to attorneys could solicit legal advice, the Commission contends the district court could not reach the conclusion that they did so here. In the Commission's view, JPMVEC "failed to supply competent evidence regarding the authors' purpose in copying counsel on the emails." Op. Br. 28. In fact, however, that purpose may be discerned from the face of the emails, as well as from the context in which they were sent.

1.    **The Senders' Purpose May Be Discerned From The Face Of The Emails**

The Commission—in positing a lack of "competent evidence"—dwells on the purported limitations of the declaration of Catherine Krupka, which it claims was the "only evidence" of the senders' motivation. Op. Br. 28. But the Commission disregards the fact that the district court inspected the emails *in camera*. The purpose of the emails could be discerned from their face. *See Alexander I*, 186 F.R.D. at 107; *Alexander II*, 192 F.R.D. at 46.

An email need not state outright that it seeks legal advice for that intent to be plain from the face of the email. After all, any attorney who responded only to explicit demands for legal advice would soon be out of a job. Thus, "[w]hile it is essential that communications between client and attorney deal with legal assistance and advice in order to be privileged, it is not essential that such requests by the cli-

**PUBLIC COPY – SEALED MATERIAL DELETED**

ent for the legal advice be expressed." *Burlington Indus. v. Exxon Corp.*, 65 F.R.D. 26, 37-39 (D. Md. 1974); *see also Hercules Inc. v. Exxon Corp.*, 434 F. Supp. 136, 144 (D. Del. 1977). When "the overall tenor of the document indicates that it is a request for legal advice or services," the document will be privileged. *In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800, 806 (Fed. Cir. 2000) (citing *In re Sealed Case*, 737 F.2d at 102.

One important way that a sender may imply a request for legal advice is to include an attorney on a communication that provides factual information relevant to the subject matter of the attorney's engagement. The attorney-client privilege protects "communications intended to keep the attorney generally apprised of con-tinuing business developments, with an implied request for legal advice thereon." *Banks v. Office of Senate Sergeant-at-Arms*, 228 F.R.D. 24, 27 (D.D.C. 2005) (quoting *Hercules,* 434 F. Supp. at 144-45). Thus, a document that is "created to keep [the client's] counsel apprised of the very situation about which the [client] sought legal assistance" may have as its purpose the solicitation of legal advice. *Id.*; *see also AT&T*, 86 F.R.D. at 624 (communication may be deemed privileged if "the information [provided] reasonably could be foreseen to be relevant to future advice or assistance").[11] This is common sense: Clients ordinarily do not keep

---

[11] *See also Burlington Indus.*, 65 F.R.D. at 37; *Jack Winter, Inc. v. Koratron Co.*, 54 F.R.D. 44, 46 (N.D. Cal. 1971).

29

PUBLIC COPY – SEALED MATERIAL DELETED

counsel abreast of relevant factual developments so that counsel will ignore the developments or *refrain* from providing legal advice on the topic.

>    **2.    The Purpose Of The Emails May Also Be Discerned From Their Context**

To the extent that the senders' purpose is not evident from the emails, it may be discerned from their context.  "The Court looks to the context of the communication and content of the document to determine whether a request for legal advice is in fact fairly implied, taking into account the facts surrounding the creation of the document and the nature of the document."  *In re N.Y. Renu*, 2008 WL 2338552, at *2; *see also*, *e.g.*, *Jack Winter, Inc.*, 54 F.R.D. at 46.  Here, the relevant context is provided by the investigation, including the initial market monitor inquiries, and is laid out in detail in the declaration of outside counsel Catherine Krupka.

The Commission criticizes Krupka's declaration on the ground that she "did not write any of the emails" and "does not appear to have personal knowledge of why other people copied attorneys on particular emails."  Op. Br. 28-29.  But, as outside counsel retained in connection with the investigation, Ms. Krupka is in a position to provide the necessary context.  Her declaration identifies the senders and recipients of the emails, explains their role in the investigation, and explains how the various emails relate to the broader ongoing conversation within the company about the investigation.  The Tenth Circuit has looked to a similar declaration

**PUBLIC COPY – SEALED MATERIAL DELETED**

for a similar purpose; that court upheld a claim of privilege as to documents pre-pared by non-lawyer employees where the company's in-house counsel stated that the documents "were prepared for my use in giving legal advice." *Motley v. Mara-thon Oil Co.*, 71 F.3d 1547, 1551 (10th Cir. 1995).

The Krupka declaration provides a granular picture of the conversation with-in the corporation in connection with the inquiry underway—some of which is laid out in generic terms in the discussion of the individual emails, *infra* 47-55—but the most important context for the emails is the simple fact that they were uniformly prompted by, composed, and sent in response to the initial market monitor inquir-ies and the Commission's own resulting investigation. That is, the emails all rep-resent the Company's and counsel's development of its strategy towards the inves-tigation. Courts take "a broad view" of the privilege where a "transaction was not a routine business matter and required considerable involvement with a state regu-latory agency." *U.S. Postal Serv. v. Phelps Dodge Ref. Corp.*, 852 F. Supp. 156, 160 (E.D.N.Y. 1994). Thus, for instance, a request for legal advice was implicit where an email was sent to a group including an attorney "concerning communica-tions with an FDA official about investigations respecting" the client, and where the client "faced a situation involving legal liability." *In re New York Renu*, 2008 WL 2338552, at *9. This is all the more true where, as here, many of the emails involve outside counsel retained in connection with the investigation;

31

PUBLIC COPY – SEALED MATERIAL DELETED

"[c]ommunications between a client and its outside counsel are presumed to be made for the purpose of obtaining legal advice." *United States v. Chevron Texaco Corp.*, 241 F. Supp. 2d 1065, 1073-74 (N.D.Cal.2002) (citing *United States v. Chen*, 99 F.3d 1495, 1501 (9th Cir. 1996)).

The Commission raises the possibility that some of the emails may concern the question of how to run JPMVEC's business in light of the investigation, and opines that such emails would not be sent for a primarily legal purpose. But that overlooks the fact that not only is any discussion with counsel about whether particular practices should be retained or modified in light of the investigation necessarily a request for legal advice, but disclosing the content of the conversation would also likely disclose the gist of the legal advice provided. Courts recognize that it is "inevitable" that "legal and business considerations may frequently be inextricably intertwined" where "legal advice is rendered in the context of . . . a business in a corporate setting." *Coleman v. Am. Broad. Cos.*, 106 F.R.D. 201, 206 (D.D.C. 1985); *see also In re OM Grp. Secs. Litig.*, 226 F.R.D. 579 (N.D. Ohio 2005). "When a lawyer has been asked to assess compliance with a legal obligation, the lawyer's recommendation of a policy that complies (or better complies) with the legal obligation—or that advocates and promotes compliance, or oversees implementation of compliance measures—is legal advice." *In re County of Erie*, 473 F.3d 413, 422 (2d Cir. 2007). Thus, "[w]hen viewed in the context" of "inves-

32

**PUBLIC COPY – SEALED MATERIAL DELETED**

tigative inquiries from the government, the email communication involve[s] a legal decision, not a business decision." *Faloney v. Wachovia Bank, N.A.*, 254 F.R.D. 204, 210 (E.D. Pa. 2008). Correlatively, an email that solicits advice in connection with such a decision is a solicitation of legal advice.

Nor is there any merit to the Commission's suggestion that an email would have to be disclosed if it simultaneously sought input from legal and business personnel. *See, e.g., In re N.Y. Renu*, 2008 WL 2338552, at *13 (upholding claim of privilege as to email "seeking legal advice from [an attorney] and business advice from other corporate personnel"). Where the legal and business aspects of a problem are "inextricably intertwined," *Coleman*, 106 F.R.D. at 206, it would be needlessly impractical to require corporate decisionmakers to separately solicit legal and business input. Indeed, such a rule would unduly frustrate the coordination that is often necessary in the corporate context to resolve multi-faceted problems; it would be akin to saying that a manager must hold separate in-person meetings with business personnel and the corporation's lawyers. *Compare In re Ford Motor Co.*, 110 F.3d 954, 966 (3d Cir. 1997), abrogated on other grounds by *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100 (2009). Corporations need not adhere to any such empty formalities to preserve the protection of the attorney-client privilege.

**PUBLIC COPY – SEALED MATERIAL DELETED**

### III. Emails Between Non-Legal Corporate Personnel Fall Within The Attorney-Client Privilege

Turning to the twelve remaining emails—sent between business or compliance personnel, and not received by attorneys—the Commission states that such communications are "generally not privileged." Op. Br. 22. But JPMVEC has never suggested otherwise; it has produced over 700,000 pages in the course of the investigation, whereas this appeal involves a mere dozen emails between non-attorneys. Notably, the Commission does *not* argue that such emails are categorically beyond the privilege. Nor could it: "[A]ttorney-client privilege can extend to communications between non-lawyer employees of a company." *Heriot v. Byrne*, 257 F.R.D. 645, 665-66 (N.D. Ill. 2009).

Courts extend the privilege to communications between non-attorneys in recognition of the special characteristics of the corporate client. Whereas an individual may solicit and consider legal advice in isolation, collective action is the hallmark of the corporate form. Individuals responsible for different aspects of the corporate entity must exchange information and expertise to coordinate the attorney-client relationship within the client. And, courts must therefore "extrapolat[e] the essential operating conditions of the privilege from the paradigm case of the traditional individual client who both supplies information to, and receives counsel from, the attorney." McCormick on Evidence § 87.1 (6th ed. 2006); *see also Upjohn*, 449 U.S. at 391; *cf. United States v. Kovel*, 296 F.2d 918, 921 (2d Cir.

34

PUBLIC COPY – SEALED MATERIAL DELETED

1961) (Friendly, J.) (extending privilege to communications between non-lawyers in light of "the complexities of modern existence").

As a general matter, this transposition of the privilege shields communications between corporate employees "made for the purpose of facilitating the rendition of professional legal services to the client."  Proposed Fed. R. Evid. 503(b), *reprinted in* 56 F.R.D. 183, 236 (1972); *see also* Restatement (Third) of Law Governing Lawyers §§ 68, 70.[12]  More specifically, two major categories of communications—both present in this case—fall within the privilege: first, corporate employees may prepare to solicit legal advice; and, second, corporate employees may relay and discuss legal advice after it has been provided.

### A.    The Privilege Shields Communications Preparing To Solicit Legal Advice Within A Corporate Client

Corporate personnel frequently need to coordinate to solicit legal advice.  To give a few examples:  Individuals with responsibility for different aspects of the corporation may work together to frame a question; a manager may ask a subordinate to relay a question to an attorney; or, where relevant information is scattered throughout a corporation, an individual may gather the facts so that they can be

---

[12]  Proposed Federal Rule of Evidence 503(b) affords protection to communications "between representatives of the client" when made for the purpose of facilitating the rendition of legal services.  56 F.R.D. at 236.  Although the proposed rule regarding privilege was never adopted, this Court has looked to it for guidance when determining the proper scope of the attorney-client privilege.  *See In re Lindsey*, 158 F.3d 1263, 1269 (D.C. Cir. 1998).

PUBLIC COPY – SEALED MATERIAL DELETED

presented to an attorney.  If such communications were subject to disclosure, protection for communications soliciting legal advice would in many cases be an empty formality, as the content of a final communication to an attorney could easily be discerned from earlier preparation.

Courts, for that reason, recognize that communications preparing to solicit legal advice are properly within the privilege.  The United States District Court for the District of Columbia, for instance, found that the attorney-client privilege protected an employee's "communicati[on] with her colleague what she intends to tell [a] lawyer . . . when both [employees] and the lawyer are working for a common employer."  *Evans v. Atwood*, 177 F.R.D. 1, 6 (D.D.C. 1997).[13]  A privileged communication preparing to solicit legal advice may also be as simple as an email setting a time to discuss a legal issue, at least so long as the email "state[s] the subject matter" to be discussed.  *S.E.C. v. Wyly*, 10 CIV. 5760 SAS, 2011 WL 3851129 (S.D.N.Y. June 17, 2011).

This protection for communications preparing to solicit legal advice extends to communications gathering information on behalf of an attorney.  *See, e.g.,*

---

[13]  *See also, e.g., Chevron Texaco Corp.*, 241 F. Supp. 2d at 1077 (disclosure of communications between non-lawyer employees regarding "intent to seek legal advice" would "undermine the purpose of the attorney-client privilege"); *In re N.Y. Renu*, 2008 WL 2338552, at *15 (upholding claim of privilege as to emails that "note the need for obtaining legal advice" or "specifically reflect[ ] the need for obtaining legal advice").

PUBLIC COPY – SEALED MATERIAL DELETED

*Mineba Co. v. Papst*, 228 F.R.D. 13, 23 (D.D.C. 2005) (upholding claim of privilege for "material[s] assembled . . . at the direction of [an attorney] for the purpose of providing a legal opinion").[14]  The Supreme Court's seminal decision in *Upjohn* itself involved such communications:   Addressing a claim of privilege over a "questionnaire" prepared by middle managers and later provided to attorneys, the Court noted that the managers "were instructed to treat the investigation as 'highly confidential' and not to discuss it with anyone *other than Upjohn employees who might be helpful in providing the requested information*."  449 U.S. at 387 (emphasis added).   Notwithstanding that the questionnaires reflected collaboration between business personnel, the Court found them privileged.

The Commission, expressing incredulity that such communications could be privileged, observes that the privilege "protects only communications, and not underlying facts."  Op. Br. 26.  But that is beside the point.  JPMVEC is not seeking to prevent disclosure of "underlying facts."  Rather, JPMVEC is seeking to prevent disclosure of *communications* in which corporate personnel discuss (among other

---

[14]  *See also Carter v. Cornell Univ.*, 173 F.R.D. 92, 94 (S.D.N.Y. 1997) (upholding claim of privilege as to communications made during internal investigation conducted by client's employee at the direction of counsel); *TransWeb, LLC v. 3M Innovative Props. Co.*, No. 10-cv-4113, 2012 WL 2878076, at *21 (D.N.J. Apr. 12, 2012) (upholding claim of privilege where email between business personnel sought information on attorney's behalf); *In re N.Y. Renu*, 2008 WL 2338552, at *10 ("[C]ommunications among non-lawyer corporate personnel are protected if the dominant intent is to prepare the information in order to get legal advice.").

**PUBLIC COPY – SEALED MATERIAL DELETED**

things) the gathering of information to solicit legal advice.  If the Commission wishes to learn about "underlying facts," it can discover them directly, rather than via emails that also provide a window into JPMVEC's legal strategy.

### B.    The Privilege Shields Communications Relaying And Discussing Legal Advice Within A Corporate Client

Corporate personnel must likewise coordinate to implement attorneys' legal advice.  For instance:  The individual who receives legal advice may not be the same as the individual responsible for putting it into practice; multiple individuals with responsibility for different aspects of an organization may need to work together to implement advice; or an individual responsible for devising a strategy to implement advice may need to solicit input from employees with different areas of expertise.  Protection for legal advice would be meaningless if such communications had to be disclosed, as the content of the advice could be discerned from subsequent deliberations.[15]

---

[15] Before the district court, the Commission questioned the extent to which legal advice is *ever* protected, characterizing protection of legal advice as a "second-tier" privilege available only where the advice would "disclose[ ]" a confidential communication from the client.  JA-38.  The Commission now appears to have abandoned that cramped view of the privilege, and for good reason.  Legal advice is privileged so long as it is "based, at least in part, on Company confidential information previously disclosed."  *In re Sealed Case*, 737 F.2d at 101; *see also Loftin v. Bande*, 258 F.R.D. 31, 34 (D.D.C. 2009) (citing *Brinton v. Dep't of State*, 636 F.2d 600, 602-03 (D.C. Cir. 1980)); McCormick on Evidence § 89 (6th ed. 2006).

PUBLIC COPY – SEALED MATERIAL DELETED

For that reason, this Court has held that the privilege "should not be defeated by some limited circulation beyond the attorney and the person within the group who requested the advice." *Coastal States*, 617 F.2d at 863 (emphasis omitted); *see also FTC v. GlaxoSmithKline*, 294 F.3d 141, 147 (D.C. Cir. 2002); *Mead Data Cent.*, 566 F.2d at 253 n.24. And the Supreme Court in *Upjohn* likewise recognized that "[a]fter the lawyer forms his or her opinion" it is of little use to the corporation unless it can be "given to the corporate personnel who will apply it." 449 U.S. at 392 (quoting *Dunlap Corp. v. Deering Miliken, Inc.*, 397 F. Supp. 1146, 1164 (D.S.C. 1974)).

Privilege for communications relaying legal advice is not lost simply because corporate personnel venture beyond a verbatim transcript of the attorney's remarks, and overlay their own opinion as to how the corporation ought to proceed in light of the advice. Thus, "[m]anagement should be able to discuss amongst themselves the legal advice given to them as agents of the corporation with an expectation of privilege." *McCook Metals L.L.C. v. Alcoa Inc.*, 192 F.R.D. 242, 254 (N.D. Ill. 2000); *see also Wilstein v. San Tropai Condo. Master Ass'n*, 189 F.R.D. 371, 379 (N.D. Ill. 1999) (same). And, "[i]t would be an unnecessary restriction of the privilege to consider it lost when top management personnel discuss legal ad-

39

PUBLIC COPY – SEALED MATERIAL DELETED

vice." *SCM Corp. v. Xerox Corp.*, 70 F.R.D. 508, 518 (D. Conn. 1976).[16]  A con-

trary rule would vitiate the privilege wherever legal advice was less than complete-

ly self-executing, as internal deliberation about how to implement the advice

would almost invariably reveal the nature of the advice itself.

Nor is there any merit to the Commission's suggestion that discussions

about legal advice must be disclosed whenever they concern the operation of the

business.  As already noted, the attorney-client privilege undoubtedly shields legal

advice pertaining to a business.  *See supra* 32-33.  That privilege is not lost simply

because corporate personnel turn around and seek to implement the advice.  Thus,

---

[16] *See also*, *e.g.*, *FTC v. Boehringer Ingelheim Pharms., Inc.*, 286 F.R.D. 101, 111 (D.D.C. 2012) (communications "between two non-lawyers" are "afforded the protection of the privilege, so long as the communications concern legal advice sought or received that was intended to be confidential"); *Preferred Care Partners Holding Corp. v. Humana, Inc.*, 258 F.R.D. 684, 696 (S.D. Fla. 2009) (upholding claim of privilege as to "communications among the corporation's employees . . . discussing the ramifications of . . . legal advice"); *Se. Penn. Transp. Auth. v. Caremarkpcs Health, L.P.*, 254 F.R.D. 253, 261-62 (E.D. Pa. 2008) (upholding claim of privilege where disclosure of emails between business personnel would "reveal [counsel's] legal advice to her clients"); *In re PEPCO Emp't Litig.*, Civ. A. No. 86-0603, 1992 WL 310781, at *5 (D.D.C. Oct. 2, 1992) (disclosure of a document drafted by a non-lawyer "would reveal the actions counsel took on behalf of [the client], which in turn would reveal [the client's] communication requesting that action"); *In re Grand Jury 90-1*, 758 F. Supp. 1411, 1413 (D. Colo. 1991) (sustaining claim of privilege as to letter from company president to board of directors discussing legal advice); *In re Fujiyama*, 83 B.R. 739, 742 (D. Haw. 1988) ("[F]ederal courts have allowed the privilege to be claimed when corporate officials discuss the lawyer's advice among themselves, on the theory that requiring disclosure of such communications would result in the disclosure of confidential communication.") (citing cases).

**PUBLIC COPY – SEALED MATERIAL DELETED**

for instance, the Third Circuit upheld a claim of privilege over the minutes of a corporate meeting where company employees aired "concerns" about a product, an attorney "examined the legal implications of some of those concerns and proposed a particular course of action," and corporate employees reached a decision in light of that advice. *In re Ford Motor Co*., 110 F.3d at 966. The Third Circuit explained that although "the ultimate decision reached by the . . . Committee could be characterized as a business decision, . . . the Committee reached that decision only after examining the legal implications." *Id.* Even if the decision was driven "principally by profit and loss, economics, marketing, public relations, or the like," it was sufficient that "it was also infused with legal concerns." *Id.*; *see also Faloney*, 254 F.R.D. at 210.

In this case, there can be no doubt that JPMVEC's response to the Commission's investigation was "infused with legal concerns." Faced with the investigation, JPMVEC had to consider how to conduct its affairs to comply with the law and reduce its potential exposure, even to meritless claims. To be sure, that decision in some instances involved business considerations; that is inevitable, where the relevant question is how to run a business. But the company's response to the investigation—in consultation with the Company's attorneys—was nonetheless inherently a legal matter squarely within the scope of the attorney-client privilege.

41

PUBLIC COPY – SEALED MATERIAL DELETED

## IV.   The District Court Did Not Abuse Its Discretion By Finding The Emails Privileged

Ultimately this case required the district court to make a factual judgment as to whether the twenty-five emails at issue are shielded by the attorney-client privilege under the foregoing legal principles.  Because each of the emails was sent as part of a broader conversation about the response to the investigation, and because each of the emails solicits, prepares to solicit, relays, or discusses legal advice within a limited group of corporate personnel, the district court did not remotely abuse its discretion when it answered that factual question by upholding JPMVEC's claim of privilege.

### A.   The Emails Must Be Viewed In Context As Part Of A Broader Conversation About The Legal Response To The Investigation

At the outset of this factual discussion, it bears emphasis that the district court properly viewed the emails in the context in which they were sent.  *See*, *e.g.*, *Jack Winter, Inc.*, 54 F.R.D. at 46.  The twenty-five emails were not transmitted in a vacuum:  Some were sent after telephone conversations, including conversations with outside counsel; some were sent in response to other emails; and all were sent against the backdrop of the Commission's investigation or the related market monitor inquiries.  That context is relevant to the privilege inquiry in at least three interrelated ways.

**PUBLIC COPY – SEALED MATERIAL DELETED**

**1.** First, that context is relevant because Courts do not ordinarily ask wheth-er a particular statement within a conversation is privileged, and instead direct the privilege inquiry to the entire conversation in which the statement is made. *See*, *e.g.*, *In re Sealed Case*, 737 F.2d at 101 (finding "no tenable basis to upset the dis-trict court's ruling that this *conversation* was privileged") (emphasis added). This is more than a matter of convenience: By focusing on conversations, rather than isolated statements, courts provide a measure of certainty to clients who might oth-erwise worry that some stray remark made in the course of an otherwise-privileged conversation will be subject to disclosure. Thus, the Supreme Court in *Upjohn* ex-plained that clients "must be able to predict with some degree of certainty whether certain *discussions* will be protected." 449 U.S. at 393 (emphasis added); *see also Howell v. Joffe*, 483 F. Supp. 2d 659, 664 (N.D. Ill. 2007).

Applied to the email context, this approach calls for a broad focus that looks beyond the individual email to the broader context in which the email was sent. After all, "[i]n the electronic age, entire conversations that were once conducted in-person or over the telephone are often conducted through the exchange of numer-ous e-mails between the communicants." *Harrisburg Auth. v. CIT Capital USA, Inc.*, 716 F. Supp. 2d 380, 394 n.24 (M.D. Pa. 2010). As in any other context, a court should "not focus on the details or subject of particular, discrete components of that conversation," and should instead "focus on the general subject or theme of

43

**PUBLIC COPY – SEALED MATERIAL DELETED**

the overall conversation." *Id.* In this case, the "general subject or theme" of that broader conversation was JPMVEC's legal response to an actual or potential Commission investigation—a matter well within the core of the attorney-client privilege.

**2.** Second, context is relevant because an email communication generally reproduces the text of the email to which it replies, as well as all prior emails in the same email "chain." Thus, courts explain that an email "consists of the text of the sender's message as well as all of the prior e-mails that are attached to it." *ChevronTexaco Corp.*, 241 F. Supp. 2d at 1075 n.5 (emphasis omitted); *see also In re Cnty. of Erie*, 473 F.3d at 416 n.2 (observing that "[c]ertain of these e-mails are better characterized as e-mail chains, because they contain the initial e-mail as well as subsequent responses"). An email, not otherwise privileged, may become privileged when reproduced as part of such a chain. For instance, an otherwise-non privileged factual email may become privileged when reproduced as part of a subsequent email forwarding the earlier communication to an attorney in order to solicit legal advice. *See Muro v. Target Corp.*, 250 F.R.D. 350, 363 (N.D. Ill. 2007), *aff'd*, 580 F.3d 485 (7th Cir. 2009).

This observation is particularly relevant here, where many of the relevant communications occurred as part of email chains. For instance, the six emails reproduced in Exhibits C and D were sent as part of email chains that originated with

PUBLIC COPY – SEALED MATERIAL DELETED

an email circulating outside counsel's legal advice—a fact that is plain even from the unredacted version of that initial email, which includes the words "spoke to Catherine Krupka" and "[s]he advised." *See* SA-25-26, 34-37. The presence of such an email in the "chain" is relevant to the privilege inquiry.

**3.** Finally, the emails' context is significant because many of the emails are short, even one-line communications whose meaning and significance may not always be clear in isolation. An email may, for instance, discuss a course of action recommended by an attorney without expressly stating that it discusses legal advice. *See*, *e.g.*, SA-11-13 ¶¶ 30, 31, 32. Or, an email may refer to a prior, privileged telephone conversation involving an attorney, and may take on added significance when viewed together with that conversation. *See*, *e.g.*, SA-14-15 ¶¶ 34, 35. Even if the significance of such a communication is not immediately clear to the Court, it would likely be clear to the Commission's Enforcement Staff, given the Staff's greater awareness of the factual background. And it would certainly become clear to the Commission if enough such communications were disclosed.

The Commission in its brief invites this Court to conclude that the information in these various emails—viewed in isolation—is not significant or worthy of the protection of the privilege. But even where individual emails do not appear to provide any great insight into JPMVEC's legal strategy, the cumulative effect of the disclosure of the communications (taken in the context of events occurring in

**PUBLIC COPY – SEALED MATERIAL DELETED**

the investigation) would be to provide the Commission with a window into JPMVEC's legal response to the investigation. Indeed, that appears to be exactly what the Commission is seeking through its subpoena, which specifically targets emails sent around the time of material developments in the investigation. That attempt to pry into the details of JPMVEC's legal strategy should be rejected.

**B.     The Emails Solicit, Prepare To Solicit, Relay, Or Discuss Legal Advice Within A Limited Group Of Corporate Personnel**

Turning from that broader context to the specific emails, this Court's *in camera* examination should confirm that each email is privileged as a communication soliciting, preparing to solicit, relaying, or discussing legal advice within a select group of corporate personnel.

**1.     The Emails Were Not Broadly Distributed**

The Commission has never seriously disputed that the emails were circulated within a limited group of corporate personnel with responsibility for the investigation. The twelve individuals who received the emails are officers acting on behalf of JPMVEC, or compliance personnel with access to information critical for outside and in-house counsel to render legal advice relating to the investigation. *See* JA-238 ¶ 25; SA-7 ¶ 25. Each played a role in responding to the investigation.

This is precisely the type of limited group of corporate personnel that may distribute communications without vitiating the privilege. After all, this Court has recognized that the "applicable standard" for circulation within a corporate client is

46

**PUBLIC COPY – SEALED MATERIAL DELETED**

"whether the . . . documents were distributed on a 'need to know' basis or to employees that were 'authorized to speak or act' for the company.'" *GlaxoSmithKline*, 294 F.3d at 147; *see also Upjohn*, 449 U.S. at 394. This standard "is not rigorous." *In re N.Y. Renu*, 2008 WL 2338552, at *17; *see also GlaxoSmithKline*, 294 F.3d at 148 (it would serve "no useful purpose" to "review the business judgment" that "a particular employee . . . have access to a corporate secret"). Rather, the purpose of the test is to protect against "random or unlimited disclosure," *Covington & Burling v. Food & Nutrition Serv.*, 744 F. Supp. 314, 323 (D.D.C. 1990), which nobody could seriously contend has occurred in this case.

## 2.    The Emails Solicit, Prepare To Solicit, Relay, Or Discuss Legal Advice

Finally—viewed *in camera* and in their proper context—each of the disputed emails is properly shielded by the attorney-client privilege as a communication soliciting, preparing to solicit, relaying, or discussing legal advice. Each email is discussed separately below:

Exhibit A (SA-20; FERC Item 1): This is an email sent between JPMVEC compliance personnel, forwarding a document that was prepared in response to the investigation (specifically, the Midwest market monitor inquiry) and that reflects counsel's legal advice. SA-8 ¶ 26; SA-20. JPMVEC's primary concern in withholding the email has been to preserve the confidentiality of the attachment, which the Commission now concedes is privileged. *See* Op. Br. 18. However, the email

**PUBLIC COPY – SEALED MATERIAL DELETED**

itself is effectively meaningless unless read in conjunction with that attachment, as the email introduces and describes the attachment's contents. Read naturally and in context, the email and attachment therefore form a single communication. The Commission is not entitled to seek only part of that communication; the entire communication is privileged and was properly withheld.

Exhibit B (SA-23; FERC Item 2): This email chain begins with a concededly privileged email from a JPMVEC compliance officer to, among others, in-house counsel Diane Genova; that email provided information to Genova so that she could provide legal advice. SA-9 ¶ 27; SA-23. The disputed email was sent between JPMVEC compliance personnel and discusses the provision of information to Ms. Genova as well as the solicitation of further legal advice. SA-9 ¶ 27. The unredacted portion of the email includes the word "Diane" and a subject line indicating that the email pertains to a "[f]ollow up meeting with Midwest ISO Market Monitor." SA-23.

Exhibit C (SA-25-26; FERC Items 3-5): In this email chain, JPMVEC officers and attorneys discuss legal advice rendered by outside counsel retained in connection with the investigation. Disclosing the details of this conversation would reveal to the Commission the nature of that legal advice.

The first email in the chain (Item 4) relays legal advice from outside counsel, Catherine Krupka, regarding JPMVEC's potential response to the investiga-

48

PUBLIC COPY – SEALED MATERIAL DELETED

tion.  SA-26.  The email is addressed to JPMVEC personnel with responsibility for the investigation, and is copied to both Catherine Krupka and Diane Genova.  That this email forwards counsel's advice is plain from the unredacted text of the email, which reads:  "spoke with Catherine Krupka . . . . She advised . . . ."

Item 3 is an email from a business officer with responsibility for the investigation; it was generated as a "reply all" to the email circulating counsel's advice. SA-26.  In it, the sender asks a question regarding JPMVEC's course of conduct in light of Krupka's advice.  SA-10-11 ¶ 29.  Two attorneys are copied to solicit legal advice.  The Commission raises the possibility that the email might primarily concern "business matters," rather than the company's response to the investigation. Op. Br. 26.   But the email raises questions about how JPMVEC ought to proceed in light of legal advice rendered in the context of the investigation and is therefore "infused with legal concerns."  *In re Ford Motor Co*., 110 F.3d at 966.

The final email reproduced in Exhibit C (Item 5) is an email from a business officer to her immediate subordinate, in which she gives instructions regarding the implementation of outside counsel's legal advice.  *See* SA-11-12 ¶ 30; SA-25.  The email therefore continues the internal discussion of that legal advice—an issue that, once again, is primarily legal even if it involves the operation of the corporate business.

49

PUBLIC COPY – SEALED MATERIAL DELETED

Exhibit D (SA-34-37; FERC Items 6-8):   This is another email chain dis-
cussing outside counsel's legal advice.  The chain begins with the same email that
inaugurates the chain reproduced in Exhibit C: the email containing the unredacted
words "spoke with Catherine Krupka" and "she advised."   SA-37.   Subsequent
emails in the chain—including emails the Commission does not seek—continue
the discussion of that advice.  SA-35-37.  In keeping with the participants' under-
standing of the conversation as a prelude to soliciting legal advice, one email con-
tains the unredacted words "if Catherine could advise."  SA-36.  Once again, dis-
closing the details of this conversation about counsel's legal advice would reveal
the nature of the advice itself.

The first new disputed email in this chain (Item 6) was sent by a business of-
ficer to a group of business and compliance personnel.  SA-35.  It references coun-
sel's legal advice about the investigation, and discusses how best to respond to that
advice.  *See* SA-12 ¶ 31.

Finally, the last two disputed emails in this chain (Items 7 and 8) were sent
from a business officer to his immediate supervisor.  SA-34-35.  These emails ref-
erence counsel's legal advice and continue the conversation regarding how to re-
spond.  *See* SA-12-13 ¶ 32.  Again, the Commission suggests these communica-
tions may primarily discuss business matters; but, again, the emails discuss the

50

**PUBLIC COPY – SEALED MATERIAL DELETED**

proper response to legal advice in the context of a government investigation and are thus "infused with legal concerns." *In re Ford Motor Co.*, 110 F.3d at 966.

Exhibit E (SA-39; FERC Items 9 and 10):  These emails are part of a chain discussing the response to the investigation.  The first email in the chain (Item 10) was sent by a compliance officer to a group of recipients including in-house counsel Diane Genova, and updates those recipients regarding the investigation.  SA-39-40.  The email was prepared in consultation with Ms. Genova and partly reflects her legal advice as well as advice of outside counsel.  *See* SA-13-14 ¶ 33.[17] Ms. Genova is copied on the email to ensure the accuracy of the summary, to solicit additional legal advice, and to keep her apprised of developments in the investigation. *Id.*

The subsequent email (Item 9) was sent by a business officer and continues the discussion of the investigation in light of the legal advice disclosed in the prior email.  SA-39.  In-house counsel Diane Genova is copied on this email in order to directly solicit legal advice, and to provide her with information that may be relevant to the provision of future legal advice.

---

[17]  The Commission intimates that advice may not have been based on client confidences, but never explains where *else* counsel would have gotten information necessary to render their advice.  After all, any JPMVEC personnel who counsel could have spoken with would be part of the corporate client.  The Krupka declaration in fact makes plain that the email reflects consultation by both in-house and outside counsel with JPMVEC personnel.  *See* SA-13-14 ¶ 33.

**PUBLIC COPY – SEALED MATERIAL DELETED**

<u>Exhibit F (SA-41; FERC Item 11)</u>:  This is an email between two compliance personnel, in which the sender comments on legal advice provided by outside counsel in a preceding telephone conversation and seeks information in order to solicit further legal advice.  *See* SA-14-15 ¶ 34.  This is indicated by the face of the redacted version of the email, which refers to "Catherine's conversation"— meaning a conversation with outside counsel Catherine Krupka.

<u>Exhibit G (SA-42; FERC Items 12-15)</u>:  This chain contains four emails sent between compliance personnel in which they discuss and coordinate efforts to gather information to facilitate the provision of legal advice.  *See* SA-15 ¶ 35.  The information was gathered at the direction of outside counsel, and the information was in fact provided to outside counsel so that she could provide legal advice.  *Id.*

<u>Exhibit H (SA-44; FERC Items 16 and 17)</u>:  This email chain concerns a then-upcoming meeting with the Commission in connection with the investigation, and ████████████████████████████████████████████  *See* SA-15-16 ¶ 36.  Both disputed emails were sent by compliance personnel to recipients including in-house counsel Diane Genova.  The emails reference earlier communications with counsel and reflect a request for additional legal advice in advance of the upcoming meeting.  *See id.*

<u>Exhibit I (SA-46; FERC Item 18)</u>:  This is an email from a business officer to JPMVEC personnel involved in the investigation; in-house counsel Diane Ge-

PUBLIC COPY – SEALED MATERIAL DELETED

nova is copied. ██████████████████████████████████

████████████████████████████████████████████████

██████, and the email itself both discloses the contents of prior, privileged communications regarding that meeting and poses a question in order to solicit further legal advice. *See* SA-16 ¶ 37.

Exhibit J (SA-48; FERC Item 19):  This is an email from a business officer to personnel involved in the investigation, including in-house counsel Diane Genova.  The email discusses how to conduct business in light of the investigation—disclosing the content of counsel's prior legal advice in the process—and in-house counsel is copied to solicit further legal advice on that topic. *See* SA-16-17 ¶ 38. Responding to the question posed in the email also required consultation with outside counsel. *Id.*

The Commission once again raises the possibility that this email merely reflects business discussions.  That suggestion, however, is belied by the context of the investigation.  Moreover, the sender specifically marked the email as "Privileged"; the sender's decision to add that notation (which was not present in the preceding email in the chain) indicates that she intended the request contained in the email to be interpreted as a request for legal advice.

Exhibit K (SA-50; FERC Items 20-23):  This is an email conversation between JPMVEC business and compliance personnel, copying in-house counsel Di-

**PUBLIC COPY – SEALED MATERIAL DELETED**

ane Genova, in which the senders discuss JPMVEC's document collection practices in response to FERC's investigation.  SA-17 ¶ 39.  Those document collection efforts were undertaken at the direction of outside counsel.  *Id.*  That much is plain even from the unredacted emails, which contain the words "in connection with document retention" and "outside counsel asked."  The emails are privileged because they reflect the collection of information to solicit legal advice, and because in-house counsel is copied in order to keep her apprised of that aspect of the response to the investigation.

The Commission claims these emails are not privileged because JPMVEC endeavored to collect documents in response to preservation requests that came from the Commission.  *See* Op. Br. 35.  The information gathered was, however, also intended be used by counsel for the provision of legal advice.  *See* SA-17 ¶ 39. The emails also disclose outside counsel's legal advice regarding how the corporation ought to respond to those preservation requests—a matter that falls within the scope of the attorney-client privilege.  *See Muro*, 250 F.R.D. at 360.

Exhibit L (SA-51; FERC Items 24 and 25):  This email chain concerns the solicitation of legal advice in connection with the investigation.  *See* SA-17-18 ¶ 40.  The first email in the chain (Item 25) was sent by a business officer to a group of business and compliance personnel.  SA-51.  The unredacted portion of the email makes clear that it is a request for legal advice, as it states, "I ask Com-

54

**PUBLIC COPY – SEALED MATERIAL DELETED**

pliance and Legal." Although no attorneys were copied on the email, it is plain from the face of the email that the sender intended for the recipients to relay the request to an attorney.

The second email in the chain (Item 24) responds to that request. SA-51. It copies both in-house counsel Diane Genova and outside counsel Catherine Krupka in order to apprise them of this request for legal advice, and therefore itself solicits their advice in connection with the question posed in the first email.

The Commission argues that these emails cannot seek legal advice because they *also* seek advice from compliance personnel. But the privilege is not lost where a business officer seeks to discuss an issue simultaneously with attorneys and non-legal personnel—particularly where those non-legal personnel are compliance officers who work closely with attorneys to ensure the corporation's compliance with the law. To the contrary, the Commission's attempt to subpoena an email that on its face requests advice from JPMVEC's attorneys is an obvious instance of prosecutorial overreach that demonstrates the Commission's apparent disregard for the attorney-client privilege.

## CONCLUSION

The judgment of the district court should be affirmed.

**PUBLIC COPY – SEALED MATERIAL DELETED**

Dated:  March 18, 2013                                   Respectfully submitted,

                                                                          /s/ Miguel A. Estrada
Catherine M. Krupka                              Miguel A. Estrada
SUTHERLAND                                          Robert E. Johnson*
700 6th Street, N.W.                               Justin Walker
Washington, D.C. 20001                       Christopher B. Leach
(202) 383-0100                                       GIBSON, DUNN & CRUTCHER LLP
catherine.krupka@sutherland.com      1050 Connecticut Avenue, N.W.
                                                                  Washington, D.C. 20036
                                                                  (202) 955-8500
                                                                  mestrada@gibsondunn.com

                                                                  * Admitted only in Virginia; practicing under the
                                                                     supervision of the Principals of the Firm.


*Counsel for Appellee J.P. Morgan Ventures Energy Corp.*

**PUBLIC COPY – SEALED MATERIAL DELETED**

### CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation established by Rule 32(a)(7)(B)(i) of the Federal Rules of Appellate Procedure because it contains 13,244 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1).  This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced font using Microsoft Word 2010 in 14-point Times New Roman type.

_____/s/ Miguel A. Estrada_____

Dated:  March 18, 2013

**PUBLIC COPY – SEALED MATERIAL DELETED**

## CERTIFICATE OF SERVICE

Pursuant to Rule 25(d) of the Federal Rules of Appellate Procedure, I hereby certify that on this 18th day of March, 2013, the foregoing brief was served by Federal Express on the following:

> Robert M. Kennedy
> David Leo Morenoff
> Robert H. Solomon
> Thomas Parker Olson
> Federal Energy Regulatory Commission
> 888 First Street, N.E.
> Washington, DC  20426

> ___/s/ Miguel A. Estrada_____